IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

**SHERRY RENEE PRUNTY,** *et al.*                                              **PLAINTIFFS**

v.                          CASE NO. 3:23-CV-00136-BSM

**COREY OBREGON,** *et al.*                                                   **DEFENDANTS**

## ORDER

Defendants' motion for summary judgment [Doc. No. 16] is granted. Plaintiffs' federal claims are dismissed with prejudice, and plaintiffs' state law claims are dismissed without prejudice.

### I. BACKGROUND

This is an extremely sad case whose undisputed material facts, as set forth in the parties' filings and the body camera footage, are as follows.

Jonesboro police officer Corey Obregon was patrolling a high-crime area around 10:30 p.m. when he noticed an unusual object in the middle of the street. Defendants' Statement of Undisputed Material Facts ("Defs.' SUMF") ¶¶ 1–4, Doc. No. 18; Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts ("Pls.' SUMF Resp.") ¶¶ 1–4, Doc. No. 25; Plaintiffs' Statement of Additional Facts ("Pls.' SAF") ¶¶ 6, 10, Doc. No. 26. As Obregon turned around his patrol car to identify the object, he spotted an individual, later identified as Jayden Prunty, and stopped to speak with him. Defs.' SUMF ¶ 5; Pls.' SUMF Resp. ¶ 5; Pls.' SAF ¶ 13.

Obregon stepped out of his car, identified himself, and as he walked toward Jayden,

Obregon stated that he was conducting "a little bit of drug interdiction in the area" and "a little bit of community policing." Defs.' SUMF ¶ 9; Pls.' SAF ¶ 19. Obregon noticed Jayden take a headphone out of his ear, and realized that Jayden may not have heard him, so Obregon repeated himself. Defs.' SUMF ¶ 10; Pls.' SUMF Resp. ¶ 10.

Jayden turned away from Obregon and began to walk away, telling Obregon that he "wasn't doing anything" and that he "was just coming from the store." Pls.' SAF ¶ 20. Obregon told Jayden to "come here," but as Jayden continued to walk away, Obregon then said "I can smell marijuana on you, come here." *Id.* ¶ 21. Jayden responded by stating, "Oh, you're lying. You're lying . . . you can't smell marijuana, bro" and continued to walk away. *Id.* ¶ 23. Obregon then quickened his pace towards Jayden, and Jayden asked him "What are you doing?" and told Obregon, "You're making me nervous," before turning to run. *Id.* ¶ 24.

Obregon chased after Jayden a short distance before pushing Jayden to the ground. Defs.' SUMF ¶ 19. Obregon then jumped on top of Jayden. Pls.' SUMF Resp. ¶ 20. Jayden initially had both hands underneath him, but then Jayden brought his left hand from beneath him and above his head when Obregon used his left hand to control Jayden's left hand. Defs.' SUMF ¶ 21. Jayden's right arm and hand are not completely visible in the video, but they appear to have remained under his body. Pls.' SAF ¶ 29. According to Obregon, he was holding Jayden's right forearm. *Id.* ¶ 30. Obregon told Jayden several times to give up his hand, and Jayden responded "no" and "I can't." *Id.* ¶ 31.

Obregon then radioed dispatch that he has "got one fighting." Defs.' SUMF ¶ 24. Obregon continued to tell Jayden to give him his hand, to which Jayden continued to refuse,

saying "no." *Id.* ¶ 26. Obregon then told Jayden to "quit reaching for whatever you're reaching for," "give me your hand," and "let go." *Id.* ¶ 27. Obregon then told Jayden, "I promise you if that's a gun, it's not going to end well for you," to which Jayden replied "I know, I know it's not." *Id.* ¶ 28. Obregon again told Jayden, "Give me your hands," and then appeared to shift positions on top of Jayden, as Jayden cried out in pain. Pls.' SAF ¶¶ 37–38.

A second later, in the video, there is the sound of a gunshot, and Obregon cries out because he has just been shot in the right upper calf by Jayden's gun. *Id.* ¶ 39; Pls.' SUMF Resp. ¶ 32. Obregon then rolled onto his right side, unholstered his own firearm, and squeezed the trigger, but his gun did not fire. Defs.' SUMF ¶ 35. Obregon testified that he did not know where Jayden's gun was at the time; however, he believed that Jayden still had the gun. Pls.' SUMF Resp. ¶ 37. After his gun failed to fire, Obregon slapped the magazine on the ground to make sure it was secure and then attempted to fire again. Defs.' SUMF ¶ 38. The gun fired towards the back of Jayden's head; however, the shot missed Jayden. *Id.* ¶ 39. After the first shot, Jayden appears in the video to be lying motionless and not fighting back. Pls.' SAF ¶ 41. After a brief pause, Obregon fired a second shot, this time striking Jayden in the back of the head, killing him. *Id.* ¶ 42. The incident, from the time Obregon first spoke with Jayden to the fatal gunshot, took approximately one minute.

Obregon's sole justification for his initial detention of Jayden is his assertion that he smelled marijuana on Jayden. Pls.' SAF ¶ 44. This assertion is corroborated in several ways. First, Jonesboro Police Chief Rick Elliott, a defendant herein, testified that when he arrived

on scene that night, he observed that Jayden "reeked" of marijuana. Pls.' SUMF Resp. ¶ 48. Second, Caleb Landreth, a special agent with the Arkansas State Police, noted in his case notes that the morning after the incident, he noticed a strong odor of marijuana when the county coroner opened Jayden's body bag at the funeral home prior to Jayden's body being transported to the state crime lab. *Id.* ¶ 54. Third, Jayden tested positive for marijuana in his toxicology reports. Defs.' SUMF ¶ 56. Jayden's parents, the plaintiffs herein, characterize Obregon's assertion that he smelled marijuana on Jayden as a "deliberate falsehood" and they question the testimony of Elliott and Landreth because of the "bias of law enforcement personnel to defend a fellow officer in an officer-involved deadly shooting case." Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment ("Pls.' MSJ Resp.") 9 n. 3, 12 n. 4, Doc. No. 24.

Jayden's parents are suing Obregon, Elliott, and the city of Jonesboro, alleging: (1) federal constitutional violations by Obregon, Compl. ¶¶ 32–43, Doc. No. 1; (2) federal constitutional violations by Elliott and the city, *id.* ¶¶ 44–57; (3) state constitutional violations by all defendants, *id.* ¶¶ 58–63; (4) negligence by all defendants, *id.* ¶¶ 64–66; (5) the tort of outrage by Elliott and the city, *id.* ¶¶ 67–72; and (6) wrongful death, *id.* ¶¶ 73–74. Defendants move for summary judgment on all claims. Doc. No. 16.

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). Once the moving party

4

demonstrates that there is no genuine dispute of material fact, the non-moving party may not rest upon the mere allegations or denials in his pleadings. *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011). Instead, the non-moving party must produce admissible evidence demonstrating a genuine factual dispute requiring a trial. *Id.* All reasonable inferences must be drawn in a light most favorable to the non-moving party. *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007). The evidence is not weighed, and no credibility determinations are made. *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008).

## III. DISCUSSION

Defendants' motion for summary judgment is granted. Plaintiffs' federal claims are dismissed with prejudice, and plaintiffs' state law claims are dismissed without prejudice.

### A.     Federal Constitutional Violations: Corey Obregon

Plaintiffs have failed to address the purported Fourteenth Amendment violations by Obregon; therefore, summary judgment is granted on this issue. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("failure to oppose a basis for summary judgment constitutes waiver of that argument"). Also, even if the Fourteenth Amendment argument has not been waived, plaintiffs' claims asserting federal constitutional violations by Obregon are properly analyzed under the Fourth Amendment and not the Fourteenth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 (1989).

Plaintiffs present three principal arguments as to why they believe Obregon committed Fourth Amendment violations. First, plaintiffs argue that the jury could reasonably find that Obregon did not have reasonable suspicion to detain Jayden because Obregon did not, in fact,

smell marijuana. *See* Pls.' MSJ Resp. 7–13. Second, plaintiffs argue that even if Obregon smelled marijuana, he did not have reasonable suspicion to detain Jayden. *See id.* at 14–15. Third, plaintiffs argue that Obregon used excessive force in arresting and killing Jayden. *See id.* at 15–19. Each argument fails because Obregon is immune from suit.

### *1. Did Obregon smell marijuana?*

"The smell of marijuana can support, at a minimum, a finding of reasonable suspicion to detain a suspect." *Ross v. City of Helena-W. Helena, Ark.*, No. 2:17-cv-00031-KGB, 2020 WL 7034479, at *9 (E.D. Ark. Nov. 30, 2020) (citations omitted).

Plaintiffs dispute a material fact—that is, that Obregon smelled marijuana. This dispute is not enough to overcome summary judgment, however, because this dispute is neither genuine nor reasonable. This is true because plaintiffs' bald statement that Obregon did not smell marijuana, taken alone, is not enough to create an issue of fact because it is self serving and totally unsupported by anything else in the record. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (for an issue of fact to be genuine, the non-moving party must show more than "some metaphysical doubt as to the material facts"); *Viewpoint Neutrality Now! v. Bd. of Regents of Univ. of Minn.*, 109 F.4th 1033, 1038 (8th Cir. 2024) (plaintiffs may not merely rely on unsupported self-serving allegations, but must have sufficient probative evidence that would permit a finding in their favor; the purpose of summary judgment is to isolate and dispose of factually unsupported claims). Indeed, when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of

6

the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001) (quoting *Gardner v. Buerger*, 82 F.3d 248, 252 (8th Cir. 1996)) ("plaintiffs may not stave off summary judgment 'armed with only the hope that the jury might disbelieve witnesses' testimony'")

Accordingly, plaintiffs' "arguments and suggestions that [Obregon] did not actually smell marijuana or acted pretextually do not convince the Court that defendants' motion for summary judgment should be denied." *Ross*, 2020 WL 7034479, at *12. Thus, on "the undisputed facts in this case, this Court concludes that an objectively reasonable police officer with Officer [Obregon's] training and experience could have reasonably believed that he smelled marijuana [on Jayden], giving [Obregon], at a minimum, reasonable suspicion to detain" Jayden. *Id.* at *14. Additionally, it was objectively reasonable for Obregon to detain Jayden based on his belief that he smelled marijuana. *See id.* "Plaintiffs have not cited this Court to a case in which an arresting officer was denied qualified immunity in analogous circumstances, and this Court has found none." *Id.* "More than evidence of a mistake is required to deny a public official qualified immunity from § 1983 damage liability." *Id.*

### 2. Did Obregon have reasonable suspicion to detain Jayden?

Obregon had reasonable suspicion to detain Jayden based on the odor of marijuana coupled with Jayden's flight, so Obregon did not violate the Fourth Amendment when he chased after Jayden and seized him. *See United States v. Wright*, 844 F.3d 759, 762–63 (8th Cir. 2016) (citing *United States v. Perdoma*, 621 F.3d 745, 749 (8th Cir. 2010)) ("Once the

uniformed officer detected an odor of marijuana coming from Wright's person, the officer had probable cause to arrest Wright and, *a fortiori*, reasonable suspicion to detain him for further investigation."); *United States v. Velazquez-Rivera*, 366 F.3d 661, 664 (8th Cir. 2004) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)) ("flight is factor that, together with other factors, supports conclusion of reasonable suspicion").

Indeed, "[t]he law distinguishes between a seizure and a stop." *United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008) (citing *Terry v. Ohio*, 392 U.S. 1, 10 (1968)). "While police must have probable cause in order to arrest (or seize) a person, they need only have reasonable suspicion that criminal activity is afoot to stop someone." *Id.* "There is no 'neat set of legal rules' that governs the determination whether the police had reasonable suspicion." *Id.* (quoting *United States v. Barker*, 437 F.3d 787, 789 (8th Cir. 2006)). "An officer's suspicion is reasonable if he 'knows particularized, objective facts that lead to a rational inference that a crime is being or has been committed.'" *Id.* (quoting *United States v. Hernandez-Hernandez*, 327 F.3d 703, 706 (8th Cir. 2003)). "But reasonable suspicion is more than an inarticulable hunch, it must instead be based on specific and articulable facts, which taken together with rational inferences, support the stop." *Id.* In determining whether the police had reasonable suspicion, the court examines the totality of the circumstances "through the eyes of the officers, because they are trained to cull significance from behavior that would appear innocent to the untrained observer." *Id.* (quoting *Barker*, 437 F.3d at 790).

Plaintiffs' "sole attack here is that, in an era of increasing decriminalization, the smell of marijuana should no longer amount to [reasonable suspicion or] probable cause." *United*

8

*States v. Wright*, No. 4:19-cr-00135-DPM, 2021 WL 2556246, at *1 (E.D. Ark. June 22, 2021). That "argument is foreclosed by binding Circuit precedent." *Id.* (citing *United States v. Winters*, 221 F.3d 1039, 1042 (8th Cir. 2000)); *see United States v. Spencer*, No. 4:20-cr-00286-BRW-02, 2024 WL 988849, at *3 (E.D. Ark. Mar. 7, 2024) (citing *Colen v. Arkansas*, 643 S.W.3d 274, 280 (Ark. Ct. App. 2022)) ("after the passage of Amendment 98 to the Arkansas Constitution in 2016, which legalized medical marijuana in the state, Arkansas courts have continued to hold that the odor of marijuana justifies a vehicular [or other type of] search").

It was therefore objectively reasonable for Obregon to believe that he had reasonable suspicion to detain Jayden and therefore Obregon is immune on this argument.

*3. Did Obregon use excessive force in arresting and killing Jayden?*

Although the outcome of the stop was tragic, Obregon is entitled to summary judgment on plaintiffs' argument that Obregon used excessive force in arresting and killing Jayden. This is true because the force used was objectively reasonable given the circumstances. *See Hollingsworth v. City of St. Ann*, 800 F.3d 985, 989 (8th Cir. 2015) (objectively reasonable force is constitutional). Government officials are immune from suit unless they violate clearly established rights. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Immunity attaches even when a government official makes a mistake of law or fact. *Id.* Summary judgment is proper, based on qualified immunity, if a defendant, as a matter of law, could have reasonably believed that his actions were lawful. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Reasonableness is judged from the perspective of a

9

reasonable officer on the scene, rather than one with 20/20 hindsight. *See Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000).

Obregon did not use excessive force in arresting and killing Jayden. As an initial matter, Obregon did not use excessive force in pushing Jayden to the ground and jumping on top of him to detain him. *See Kelsay v. Ernst*, 933 F.3d 975, 981–82 (8th Cir. 2019) (en banc) ("Where the district court correctly acknowledged that [plaintiff] 'had been told to stop but kept walking instead,' . . . [t]he constitutionality of [defendant's] takedown was not beyond debate, and he is thus entitled to qualified immunity."). Then, after a brief struggle, Obregon was shot by Jayden's gun. After this, it was objectively reasonable for Obregon to use deadly force on Jayden. *See Sinclair v. City of Des Moines, Iowa*, 268 F.3d 594, 596 (8th Cir. 2001) (per curiam) ("no constitutional or statutory right exists that would prohibit a police officer from using deadly force when faced with an apparently loaded weapon"). Plaintiffs' argument that the gun could have gone off accidentally or that Obregon discharged the gun himself accidentally after taking control of it does not change this. *See Fitzgerald v. Patrick*, 927 F.2d 1037, 1039 (8th Cir. 1991) (per curiam) (officers justified in using deadly force because "a shot had been fired . . . either accidentally or on purpose"). It also does not matter that Obregon did not know where Jayden's gun was at the time. *See Thompson*, 257 F.3d at 899 (citing *Ryder v. City of Topeka*, 814 F.2d 1412, 1419 n. 16 (10th Cir. 1987)) ("An officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force . . . ."). Moreover, it was objectively reasonable for Obregon to believe that Jayden still posed a threat to him after Obregon's first shot through

10

the time he fired the fatal second shot. Indeed, accepting "for purposes of summary judgment that [Jayden] was neither advancing toward [Obregon] nor holding the [gun toward Obregon, Jayden] still had been noncompliant and could have caused serious injury or death in a matter of seconds by repositioning himself and the" gun. *Swearingen v. Judd*, 930 F.3d 983, 988 (8th Cir. 2019).

Although this entire event is awful, Obregon's use of force was objectively reasonable given the circumstances. Therefore, Obregon is immune on this argument, and he is thus entitled to summary judgment on all of plaintiffs' federal claims.

        B.        <u>Federal Constitutional Violations: Rick Elliott and the City of Jonesboro</u>

Summary judgment is granted on plaintiffs' claims against Elliott and the city because Obregon committed no underlying federal constitutional violation. *See McCoy v. City of Monticello*, 411 F.3d 920, 922–23 (8th Cir. 2005) (city cannot be held liable unless the defendant police officer is found liable on an underlying substantive claim); *Roe v. Humke*, 128 F.3d 1213, 1218 (8th Cir. 1997) (police chief cannot be held liable given absence of underlying violation of constitutional rights). Therefore, the claims against the city and Elliott must be dismissed with prejudice even if there were improper city rules or regulations. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point") (emphasis in original).

        C.        <u>State Law Claims</u>

Plaintiffs' remaining state law claims for state constitutional violations, negligence,

the tort of outrage, and wrongful death are dismissed without prejudice because the balance of factors to be considered in whether to exercise supplemental jurisdiction—judicial economy, convenience, fairness, and comity—points towards declining to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. Plaintiffs' federal claims are dismissed with prejudice, and plaintiffs' state law claims are dismissed without prejudice.

IT IS SO ORDERED this 12th day of August, 2025.

_____
UNITED STATES DISTRICT JUDGE